# UNITED STATES DISTRICT COURT

for the
Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) Case No. 2:21-MJ-05488 |
| One Apple iPhone 12 bearing serial number | ) |
| G0NDT28Q0D4C (the "SUBJECT DEVICE") as | ) |
| Described in Attachment A | ) |
| | ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1343 | Wire Fraud |

The application is based on these facts:

See attached Affidavit

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s/ Douglas Soika*

*Applicant's signature*

Douglas Soika, FBI Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

*Judge's signature*

City and state: <u>Los Angeles, CA</u>        Hon. Patricia Donahue, U.S. Magistrate Judge

*Printed name and title*

AUSA: Maria Elena Stiteler (x6148)

**ATTACHMENT A**

PROPERTY TO BE SEARCHED

The following digital device (the "SUBJECT DEVICE"), was seized by Federal Bureau of Investigations (FBI) Special Agents on December 3, 2021, and retained in evidentiary custody of FBI in Los Angeles, California:

1.    One Apple iPhone 12 bearing serial number G0NDT28Q0D4C.

**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

　　1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Section 1343 (Wire Fraud) (the "Subject Offense"), namely:

　　　　a.   All information and records regarding the redemption and purchase of gift cards;

　　　　b.   All communications with Santa Claus e-Commerce Co. Ltd and/or "Robin";

　　　　c.   All communications between JUN WANG and other co-conspirators (to include individuals JUN WANG may have instructed, advised, or trained);

　　　　d.   All information and records regarding any identified or identifiable victims who purchased gift cards and/or submitted ;

　　　　e.   All information and records regarding fraud schemes with respect to individual victims or groups;

　　　　f.   All information and records regarding JUN WANG's schedule or travel from June 1, 2019, to the present; and

　　　　g.   All bank records, checks, credit card bills, account information, and other financial records;

　　　　h.   Data, records, documents, or information (including electronic mail and messages) pertaining to obtaining, possessing, using, or transferring personal and/or financial transaction identification information or personal identifying information

("PII") for persons other than JUN WANG ("WANG"), such as names, addresses, phone numbers, credit and debit card numbers, security codes, bank account and other financial institution account numbers, Social Security numbers, email addresses, IP addresses, as well as PIN numbers and passwords for financial institutions or internet service providers;

      i.   Records, documents, programs, applications, or materials pertaining to applications for, or use of, credit or debit cards, bank accounts, or merchant processor accounts;

      j.   Data, records, documents (including e-mails), or information reflecting or referencing purchases of merchandise, securities, electronic currency, and other valuable things;

      k.   Any documents or records relating to any bank accounts, credit card accounts, or other financial accounts;

      l.   Contents of any calendar or date book stored on the SUBJECT DEVICE;

      m.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations;

      n.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show address book information, including all stored or saved telephone numbers;

      o.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed

through any push-to-talk functions, as well as all received or missed incoming calls;

       p.  Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

       q.  Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named Subject Violation; and

       r.  Audio recordings, pictures, video recordings, or still captured images of gift cards and/or receipts for gift cards; and

    2.  With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

       a.  evidence of who used, owned, or controlled the SUBJECT DEVICE at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

   b. evidence of the presence or absence of software that would allow others to control the SUBJECT DEVICE, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c. evidence of the attachment of other devices;

   i. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the SUBJECT DEVICE;

   d. evidence of the times the SUBJECT DEVICE was used;

   e. passwords, encryption keys, and other access devices that may be necessary to access the SUBJECT DEVICE;

   f. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the SUBJECT DEVICE or to conduct a forensic examination of it;

   g. records of or information about Internet Protocol addresses used by the SUBJECT DEVICE;

   h. records of or information about the SUBJECT DEVICE's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

 2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created,

modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II.   SEARCH PROCEDURE FOR DIGITAL DEVICES

3.   In searching the SUBJECT DEVICE (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.   The search team will, in its discretion, either search the SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.   The search team shall complete the search of the SUBJECT DEVICE as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the SUBJECT DEVICE beyond this 120-day period without obtaining an extension of time order from the Court.

d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in the SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of

the items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

e. The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

f. If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

g. If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

h. If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital

device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the SUBJECT DEVICE has expired) absent further court order.

i.   The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the SUBJECT DEVICE (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the SUBJECT DEVICE or files contained therein is/are encrypted.

j.   After the completion of the search of the SUBJECT DEVICE, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

k.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

l.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not

apply to any search of digital devices pursuant to any other court
order.

## AFFIDAVIT

I, Douglas Soika, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.  This affidavit is made in support of an application for a warrant to search the following digital device in the custody of the Federal Bureau of Investigation ("FBI") in Los Angeles, California, as described more fully in Attachment A:

a.  One Apple iPhone 12 bearing serial number G0NDT28Q0D4C (the "SUBJECT DEVICE")

2.  The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Section 1343 (Wire Fraud) (the "Subject Offense"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

3.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### II. BACKGROUND OF AFFIANT

4.  I have been a Special Agent with the FBI since August of 2005.  I am currently assigned to the FBI's Albany Division

where I investigate all criminal matters to include frauds and swindles, wire fraud, mail fraud, and money laundering.  I have participated in numerous successful investigations into illicit drug distribution networks, violent crime, white collar crime, human trafficking, and crimes against children.  I have been involved in the monitoring, intercepting, and recording of court ordered wiretaps.  I have participated in numerous search warrants and arrests involving narcotics, fraud, human trafficking, and crimes against children.  In addition to my above-mentioned experience, I have had the opportunity to speak with and observe other federal and state investigators in the investigation of wire fraud, mail fraud, bank fraud, money laundering, and aggravated identity theft.

### III.  SUMMARY OF PROBABLE CAUSE

5.   As described further below, I respectfully submit there is probable cause to search the SUBJECT DEVICE described above and in Attachment A, which is the personal cellular telephone of JUN WANG, for evidence of WANG's involvement in a wire fraud scheme involving obtaining and cashing gift cards from victims who buy electronic gift cards and provide them as payment based on false and fraudulent statements.

6.   FBI agents in Los Angeles seized the SUBJECT DEVICE from JUN WANG on December 2, 2021, after WANG made post-*Miranda* admissions regarding his use of the SUBJECT DEVICE in processing gift card payments, which he claims were done at the behest of a company in China.  WANG is believed to have processed more than $2 million in electronic gift cards obtained by fraud, using the

SUBJECT DEVICE and/or other electronic devices to communicate with others about the relevant gift card information.

7.    The SUBJECT DEVICE is in the custody of FBI in Los Angeles, California, in the Central District of California, after it was seized from WANG on December 2, 2021, pending application to this Court for a warrant authorizing the search and seizures of the SUBJECT DEVICE.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

8.    Based on my review of law enforcement reports, conversations with other law enforcement agents and with witnesses, and my own knowledge of the investigation, I am aware of the following:

### A.    Investigation of Jun Wang's Involvement in Gift Card Transactions

9.    I learned the following from the Sherrill, NY police department and from an individual whose initials are C.W.:  On June 19, 2019, a Sherrill, NY, resident, C.W.,[1] received a phone call from an unknown male who identified himself as "Max" regarding an alleged security breach on her computer.  At the direction of Max, C.W. provided remote access to her computer. Max told C.W. that he fixed the breach and thereafter demanded the payment of $3,500 to be made through the purchase of gift cards.  C.W. complied and purchased gift cards.  Receipts provided by C.W. show that on June 19, 2019, at approximately 5:10 p.m., C.W. purchased gift card 6171290772436705 ($500) and 6171290772445669 ($500), from a Walmart store in Oneida, NY.

---

[1] The identities of all victims described in this affidavit by initials can be provided to the Court upon request.

C.W. then provided the gift card number to Max (or another unknown male) over the telephone. Walmart provided me with documents showing that at approximately 5:37 p.m, just twenty-seven minutes after C.W. purchased the two gift cards, an individual using Sam's Club Member 950403923 redeemed gift cards 6171290772436705 and 6171290772445669 at a Sam's Club store located in Orlando, FL. Walmart records show that Sam's Club member 950403923 is registered to JUN WANG, telephone 407-684-5849, residing at 2823 Livingston St, Orlando, FL, date of birth June 4, 1962. Furthermore, Walmart provided me with a video surveillance photo which depicts a person I recognize as JUN WANG redeeming and purchasing gift cards at a self-checkout kiosk on June 19, 2019, at approximately 5:37 p.m.

    10. On August 5, 2020, I interviewed Latham, NY, resident A.M. From July 22, 2019, through July 25, 2019, A.M. communicated (through email and text message) with a person who identified herself as "Dianna". Dianna sent A.M. a check (though FedEx) for $1,941 and instructed her to cash the check and use the money to purchase Walmart gift cards. As directed, A.M. purchased three gift cards from a Walmart store in Latham, NY (6170284182232561 ($500), 6167991696418164 ($300), and 6167976543894179 ($500)). A.M. made these purchases on July 25, 2019, between 1:41 p.m. and 2:04 p.m. A.M. was instructed to text Dianna photos of the gift cards and receipts, which she did. Dianna then asked A.M. to purchase additional gift cards but A.M. refused. Later, A.M. learned that the $1,941 check was dishonored by the bank and that she had to pay bank service fees

as a result.  Documents provided to me by Walmart show that
Sam's Club member 950403923 (previously identified as JUN WANG)
redeemed these gift cards on July 25, 2019, at 2:48 p.m.,
minutes after A.M. purchased them.

11.  On September 24, 2020, I interviewed M.Y., who
reported that on September 11, 2020, she was contacted by
several individuals who described themselves as "law enforcement
officers."  The "officers" told M.Y. she was involved in a
criminal investigation and that she needed to liquidate her bank
accounts in order to safeguard her savings.  M.Y. was instructed
to purchase gift cards and to provide the gift card numbers to
the "officers."  Documents provided by Walmart show that on
September 11, 2020, between 5:23 p.m. and 5:26 p.m., M.Y.
purchased three Walmart gift cards at a Walmart store in
Watertown, NY ($600 total).  Documents provided by Walmart show
that between 6:11 p.m. and 6:12 p.m., these gift cards were
redeemed at a Walmart store in Titusville, Florida.  Walmart
also provided your affiant with a surveillance photo of the
transaction.  In the photo I recognize JUN WANG as the person
redeeming the gift cards and then purchasing new gift cards at
the self-checkout.

12.  Analysts at Walmart's Global Investigations Unit who
have been investigating gift card redemptions by JUN WANG have
reviewed and collected video footage of JUN WANG redeeming gift
cards, and the analysts estimate that between March 14, 2020,
and June 17, 2021, JUN WANG redeemed approximately $2,466,931 in
gift cards at Sam's Club and Walmart stores in Florida and

throughout the United States.  Your affiant has reviewed some, but not all, of this Walmart surveillance video footage.

**B.   Jun Wang's Travel and Criminal Complaint from Pennsylvania**

13.   I have learned from U.S. Customs and Border Protection that JUN WANG departed the United States on July 4, 2021, by flying from Los Angeles California International Airport (LAX) to Guangzhou Baiyun International Airport (China).

14.   On August 23, 2021, a criminal complaint was filed by the Northumberland County (Pennsylvania) District Attorney's Office charging JUN WANG with one count of Dealing In Proceeds Of Unlawful Activities (felony) and one count of Knowledge That Property Is Proceeds Of An Illegal Act (felony), based on his alleged redemption of gift cards provided by one or more fraud victims.  The complaint was signed by Magistrate District Judge Michael Patrick Toomey (Commonwealth of Pennsylvania).

15.   On October 12, 2021, Magistrate District Judge Toomey received a fax from someone purporting to be JUN WANG.  In the fax, JUN WANG explained, in summary, that the charges against him were false.  Furthermore, JUN WANG offered to provide documents that would prove his innocence.  This fax was provided to the Pennsylvania investigators.

16.   As I understand from communicating with the lead investigator for the Pennsylvania investigation: the investigator reached out to JUN WANG by email in response to his fax.  On October 20, 2021, the lead investigator for the Pennsylvania investigation received an email from JUN WANG in

which WANG explained that "Santa Claus e-Commerce Co. Ltd," a
Chinese-based company (the "Company"), asked him to redeem
Walmart gift cards and then use the proceeds to purchase new
gift cards (such as iTunes, Google Play, and Steam).[2]  The
Company used WeChat to send WANG the gift card codes.  WANG
explained that he used the GiftMe cell phone app to generate
gift card bar codes which he scanned at self-checkout. After
completing the transaction, WANG took photos of each card (and
receipt) and sent the information to the Company through WeChat.
WANG also explained in his email that he learned the Company
bought the gift cards that he redeemed from a person known as
"Robin."  Robin sold the gift cards to the Company at "5.3 and
5.05 yuan per Walmart card dollar value".  The Company wired
money to Robin's bank account.  Additionally, WANG provided
screen shots of communications between the Company and Robin to
include Robin's WeChat account, Robin's bank account
information, communications about gift card prices, transaction
receipts, and gift card codes.  Lastly, WANG provided a screen
shot of the four Walmart gift cards (codes) that he received
from the Company (through WeChat) and a screenshot of receipts
of the gift cards he purchased for the Company.

   C.   **Jun Wang's Return to the United States and Admissions
        Regarding the SUBJECT DEVICE**

   17.  On December 2, 2021, at approximately 6:30 p.m.
(Pacific), JUN WANG returned to the United States by arriving at

---

[2] This email can be provided to the Court upon request.

Los Angeles California International Airport (LAX) on a flight from China.

18. After JUN WANG arrived at LAX, he was approached by FBI Special Agents Crystal Morelos and Ryan Nicolos, who asked to speak with him. JUN WANG agreed to speak with them. At the outset of the conversation, Agents Morelos and Nicolos read JUN WANG his *Miranda* warnings, and he agreed to speak with them and answer questions. JUN WANG also signed a consent form authorizing law enforcement to search his cell phone, identified herein as the SUBJECT DEVICE.

19. During the interview, JUN WANG admitted that he redeemed gift cards in conjunction with a company in China, and that he used the SUBJECT DEVICE to get the information to redeem gift cards. WANG explained that he was instructed after purchasing gift cards to destroy the receipts, take a picture of the destroyed receipts, and send that picture to the company in China through an application called WeChat.

20. WANG also claimed during the interview that he had removed the SIM card from the SUBJECT DEVICE, but during the interview, JUN WANG showed agents WeChat communications that appeared to be between him and the Company. The agents also saw what appeared to be gift card serial numbers on the SUBJECT DEVICE.

   a. JUN WANG also stated that he worked with the company in China for about a year, and he estimated that he redeemed a total of approximately $50,000 in gift card

redemptions.  JUN WANG also claimed that if the transactions were bad, then it was the police's job to investigate.

b.  Following the interview, Agents Morelos and Nicolos seized the SUBJECT DEVICE based on probable cause that it contains evidence of one or more crimes of wire fraud, in violation of 18 U.S.C. § 1343, regarding the redemption of gift cards purchased by fraud victims as part of one or more fraud schemes.  This probable cause seizure was made in order to secure the SUBJECT DEVICE while law enforcement officers seek a search warrant, in order to prevent spoilation of evidence.  The SUBJECT DEVICE was powered off after it was seized, and it has not been searched since it was seized.  The SUBJECT DEVICE is currently in the possession of the FBI in Los Angeles, California.

## V.  **TECHNICAL TERMS**

21.  Based on my training and experience, I use the following technical terms to convey the following meanings:

a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These

capabilities include: storing names and phone numbers in
electronic "address books;" sending, receiving, and storing text
messages and e-mail; taking, sending, receiving, and storing
still photographs and moving video; storing and playing back
audio files; storing dates, appointments, and other information
on personal calendars; and accessing and downloading information
from the Internet.  Wireless telephones may also include global
positioning system ("GPS") technology for determining the
location of the device.

      b.   Digital camera:  A digital camera is a camera
that records pictures as digital picture files, rather than by
using photographic film.  Digital cameras use a variety of fixed
and removable storage media to store their recorded images.
Images can usually be retrieved by connecting the camera to a
computer or by connecting the removable storage medium to a
separate reader.  Removable storage media include various types
of flash memory cards or miniature hard drives.  Most digital
cameras also include a screen for viewing the stored images.
This storage media can contain any digital data, including data
unrelated to photographs or videos.

      c.   Portable media player:  A portable media player
(or "MP3 Player" or iPod) is a handheld digital storage device
designed primarily to store and play audio, video, or
photographic files.  However, a portable media player can also
store other digital data.  Some portable media players can use
removable storage media.  Removable storage media include
various types of flash memory cards or miniature hard drives.

This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.    GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.    PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive

11

e-mail.  PDAs usually include a memory card or other removable
storage media for storing data and a keyboard and/or touch
screen for entering data.  Removable storage media include
various types of flash memory cards or miniature hard drives.
This removable storage media can store any digital data.  Most
PDAs run computer software, giving them many of the same
capabilities as personal computers.  For example, PDA users can
work with word-processing documents, spreadsheets, and
presentations.  PDAs may also include global positioning system
("GPS") technology for determining the location of the device.

   f. Tablet:  A tablet is a mobile computer, typically
larger than a phone yet smaller than a notebook, that is
primarily operated by touching the screen.  Tablets function as
wireless communication devices and can be used to access the
Internet through cellular networks, 802.11 "wi-fi" networks, or
otherwise.  Tablets typically contain programs called apps,
which, like programs on a personal computer, perform different
functions and save data associated with those functions.  Apps
can, for example, permit accessing the Web, sending and
receiving e-mail, and participating in Internet social networks.

   g. Pager:  A pager is a handheld wireless electronic
device used to contact an individual through an alert, or a
numeric or text message sent over a telecommunications network.
Some pagers enable the user to send, as well as receive, text
messages.

   h. IP Address: An Internet Protocol address (or
simply "IP address") is a unique numeric address used by

computers on the Internet.  An IP address is a series of four
numbers, each in the range 0-255, separated by periods (e.g.,
121.56.97.178).  Every computer attached to the Internet
computer must be assigned an IP address so that Internet traffic
sent from and directed to that computer may be directed properly
from its source to its destination.  Most Internet service
providers control a range of IP addresses.  Some computers have
static—that is, long-term—IP addresses, while other computers
have dynamic—that is, frequently changed—IP addresses.

    i.    Internet: The Internet is a global network of
computers and other electronic devices that communicate with
each other.  Due to the structure of the Internet, connections
between devices on the Internet often cross state and
international borders, even when the devices communicating with
each other are in the same state.

    22.  Based on my training and experience, I know that the
SUBJECT DEVICE, an Apple iPhone 12, has capabilities that allow
it to serve as a wireless telephone, digital camera, portable
media player, GPS navigation device, and PDA.  In my training
and experience, examining data stored on devices of this type
can uncover, among other things, evidence that reveals or
suggests who possessed or used the device.

### VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

    23.  As used herein, the term "digital device" includes the
SUBJECT DEVICE.

    24.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

14

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

25.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000

average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

26.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII.   ELECTRONIC STORAGE AND FORENSIC ANALYSIS

27.   Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

28.   *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the SUBJECT DEVICE was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the SUBJECT DEVICE because:

a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.   Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution"

16

evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d.   The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

   e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

   29.   *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the SUBJECT DEVICE consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many

parts of the SUBJECT DEVICE to human inspection in order to determine whether it is evidence described by the warrant.

30. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

### VIII.    CONCLUSION

31. For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 1343 (Wire Fraud) will be found in the search of the SUBJECT DEVICE, as described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this ____ day of
December, 2021.

_____
HONORABLE PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE